J-S12013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1726 MDA 2016 |

Appeal from the Order Entered October 6, 2016
In the Court of Common Pleas of Adams County
Orphans' Court at No(s):  RT-9-16(A)


BEFORE:   PANELLA, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY PANELLA, J.                    **FILED MARCH 03, 2017**

E.B. ("Mother") appeals from the order entered[1] in the Adams County

Court of Common Pleas involuntarily terminating her parental rights to her

son, L.L. ("Child"), born in July 2009.[2] We affirm.[3]

_____

[1] Mother's notice of appeal states that the order terminating her parental rights and changing the goal to adoption "has been entered in the docket…." Notice of Appeal, filed 10/14/16. The certified docket entries indicate only that the order's "File Date" was October 5, 2016. **See** Case Display Report, at 1 (document #37 in certified record).

  "[N]o order of a court shall be appealable until it has been entered upon the appropriate docket in the lower court." Pa.R.A.P. 301(a)(1). The entry of an order and the specific date of entry is defined in Rule 108(b): "The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b)." Pa.R.A.P. 108(b). Rule 236(b) requires that "[t]he prothonotary shall note in the docket the giving of the notice…." "Thus,
*(Footnote Continued Next Page)*

pursuant to the express terms of the rules, an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." ***Frazier v. City of Philadelphia***, 735 A.2d 113, 115 (Pa. 1999) (citations omitted). ***See also*** G. Ronald Darlington, et al., Pennsylvania Appellate Practice § 108:10, Volume 20 (2016-2017 ed.). "[T]his is a bright-line rule, to be interpreted strictly." ***In re L.M.***, 923 A.2d 505, 509 (Pa. Super. 2007).

The Court of Common Pleas of Adams County's docket entries do not comply with Rule 236(b). As noted, the entry simply indicates the "File Date." There is no indication in the docket entries when the Prothonotary provided notice to the parties. Handwritten on the order is a notation, dated "10/6/16," that "CERT COPIES" were sent to the attorneys and parties involved. Order, dated 9/27/16, and filed 10/5/16. That is an incorrect procedure as it defies explicit procedural requirements mandated in the rules. "The procedural requirements reflected in the rules serve to promote clarity, certainty and ease of determination, so that an appellate court will immediately know whether an appeal was perfected in a timely manner, thus eliminating the need for a case-by-case factual determination." ***Frazier***, 735 A.2d at 115 (citation omitted). And the Court cautioned the fact "that the parties may have received notice of the order does not alter the formal date of its entry and the associated commencement of the period allowed for appeal for purposes of the rules." ***Id***.

As explained above, the appeal period in this case was never formally triggered. ***See Frazier***; ***In re: L.M.*** It would, however, be a waste of judicial resources to remand this matter now solely for the proper filing and notation of Rule 236(b) notice. Accordingly, in the interest of judicial economy, we will regard as done what should have been done and address this appeal on the merits. ***See id***., at 509 (addressing appeal on merits where notice of appeal was filed well after entry of the order where the docket did not show providing of notice).

But we caution the Clerk of Courts of the Court of Common Pleas of Adams County to comply with Rule 236(b). Otherwise, the Clerk of Courts is entering orders without triggering appeal periods. And that is simply unacceptable.

**We direct the Honorable Michael A. George to provide a copy of this decision to Kelly A. Lawver, the Clerk of Courts of Adams County.**

The orphans' court set forth findings of fact, which the testimonial evidence supports. Therefore, we adopt the court's findings herein. *See* Findings of Fact, 9/27/16, at ¶¶ 1-30.

By way of procedural background, Child was referred to York County Children and Youth Agency on July 28, 2014, at which time he was five years old. *See* Findings of Fact, 9/27/16, at ¶ 1. The referral alleged that Mother was under the influence of controlled substances, and that she and Child were living in a motor vehicle. *See id*., at ¶ 3. On July 29, 2014, the York County Court of Common Pleas placed Child in emergency protective custody, and he was immediately placed in kinship care. *See id*., at ¶ 4.

Child was adjudicated dependent on August 18, 2014, and a permanency plan of reunification was established. *See id*., at ¶ 7. Mother was directed to satisfy the following Family Service Plan ("FSP") goals: obtain and maintain safe and stable housing; undergo drug and alcohol evaluation and assessment and follow through with all treatment recommendations; undergo random drug testing; cooperate in a psychological evaluation and with family support services at Pressley Ridge; participate in Child's medical and educational appointments. *See* N.T.,

*(Footnote Continued)* ─────────────

[2] By separate order, the orphans' court terminated the parental rights of J.L. ("Father"). Father did not file a notice of appeal.

[3] We observe that the Guardian *Ad Litem* filed a letter in support of the appellee brief of Adams County Children and Youth Services ("CYS"), wherein it argues in support of the subject order.

Hearing, 9/8/16, at 30. On October 23, 2014, the Adams County Court of Common Pleas accepted jurisdiction of this dependency case because Mother had established residency in Adams County. *See* Findings of Fact, 9/27/16, at at ¶ 10.

On July 15, 2016, CYS filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) and to change Child's placement goal to adoption. The court held an evidentiary hearing on September 8 and 9, 2016, during which CYS presented the following witnesses: Kayla Smith, the supervisor at York County Children and Youth Agency; Carolynne Saum, a CYS caseworker; Lori Dewald, a licensed behavior specialist who served as Child's therapist; B.K., Child's foster mother; and Samantha Myers, a social worker at Bethany Christian Services. Mother testified on her own behalf, and she presented the testimony of her mother, M.D. ("Maternal Grandmother").

The orphans' court involuntarily terminated Mother's parental rights. Mother timely filed a notice of appeal[4] and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate

---

[4] Mother's notice of appeal states that she is appealing "from the order entered in this matter on the 20th day of September, 2016." Notice of Appeal, filed 10/14/16. There is no order from September 20, 2016. As noted in footnote one, the order was dated September 27, 2016, and entered on the docket on October 5, 2016.

Procedure 1925(a)(2)(i) and (b). The orphans' court filed a Rule 1925(a)

opinion.

We review Mother's appeal according to the following standard:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated

analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we conclude that the certified record supports the decree pursuant to Section 2511(a)(1) and (b), which provides as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1), (b).

Parental rights may be terminated pursuant to Section 2511(a)(1) "if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties." *In re C.M.S.*, 832 A.2d

457, 462 (Pa. Super. 2003) (emphasis in original; citation omitted). Our

Supreme Court has held that

> [o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988) (citation

omitted). Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Additionally, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id*. (citation omitted).

On appeal, Mother argues that the orphans' court abused its discretion in terminating her parental rights pursuant to Section 2511(a)(1) because

- 7 -

she had found employment and suitable housing, maintained her own transportation, and she had overnight visits with Child. **See** Mother's Brief, at 14. We disagree.

The orphans' court found that "it appeared Mother . . . moved in a positive direction in addressing her substance abuse issues" until the spring of 2015, when she "was involuntarily discharged from her treatment placement and consequently had not completed her drug and alcohol treatment." Trial Court Opinion, 10/31/16, at 3-4. The court continued as follows:

> By mid-September, 2015, Mother had further deteriorated in meeting reunification expectations. Although there were no positive test results for use of controlled substances, she did have four absences from appointments with the Agency which would have included random drug testing. She did finally complete a drug and alcohol evaluation which revealed a need for outpatient treatment[;] however, once again [she] failed to follow through with treatment. She was ultimately discharged by the drug and alcohol treatment provider due to non[-]attendance. At a permanency review hearing on September 15, 2015, she promised the [c]ourt that drug and alcohol sessions would probably resume. Yet [as] of the date of [the] termination hearing, she could not provide any proof of honoring her representation.

**Id**., at 4.

At the time of the termination hearing, the court found that Mother's progress in satisfying the permanency plan was as follows:

> Mother has stabilized her housing[;] however, at the time of the termination hearing, [she] was collecting unemployment. As mentioned, despite her earlier indication to the [c]ourt that she would probably resume drug and alcohol counseling, she has been unable to provide any proof of the same. She has not

followed through with obtaining a mental health evaluation or counseling nor has [she] ever made any effort to cooperate with family support services at Pressley Ridge. She has not attended medical appointments, meetings with the child's counselors, or involved herself in the child's educational programming. Her visitations, including overnight scheduled visitations, have been sporadic. Meanwhile, [Child] continues to thrive in a foster setting and has continued to bond with his foster parents. . . . However, [Child's] soiling incidents have continually increased during the time periods consistent with the visits between [him] and Mother. At the time of the termination hearing, [Child] was in the care of [CYS] for 27 months since original placement with Mother yet having accepted the responsibility of performing parental duties.

This history reveals a pattern of promises on the part of Mother followed by a lack of any affirmative action.

*Id*., at 5-6.

Upon thorough review, the testimony of Carolynne Saum, the CYS caseworker, supports the court's findings. Significantly, the record reveals that, at the time of his placement, Child had severe tooth decay, which caused him to have trouble eating and to have sensitivity to extreme hot and cold. *See* N.T., 9/8/16, at 21-22, 32-33. As a result, Child needed to have multiple baby teeth extracted. *See id*., at 22, 32, 49-50. Ms. Saum explained that, approximately four months before the termination hearing, Child had spacers put in his mouth to stabilize his teeth. *See id*., at 52. She testified, "there is a concern [Mother] just isn't aware of what the long-term needs are as far as" Child's teeth. *Id*.

In addition, Kayla Smith, the supervisor at the York County Children and Youth Agency, testified that, at the time of Child's placement, "[h]e had

been defecating in his pants and having some behavioral problems after phone calls with mom. . . ." N.T., Hearing, 9/8/16, at 23. Ms. Saum testified that, beginning sometime between October to December 2015, Child "really regressed as far as . . . his behaviors and soiling incidents after visitation" with Mother. *Id*., at 55. She explained:

> [H]e had bed wetting at night for the life of the case, and it still is something that is being worked on with him today. He had started defecating more during that October to December timeframe. He would be, after visits with mom, sometimes very regressi[ve] in his independence. He would say he couldn't do things by himself, and then . . . in February [of 2016], he was having . . . some significant tantrums.

*Id*., at 56. Ms. Saum testified that Child's behavior "correlated to either a missed visit with mom or occurring in the few days after visitation with his mom." *Id*. Further, Ms. Saum stated that Child's family doctor ruled out a medical reason for his soiling. *See id*., at 68. She explained that Child participated in a psychological evaluation, and "the evaluator felt that [Child's soiling] was probably like a psychological and a psycho[-]emotional reason. . . ." *Id*. Ms. Saum testified that Child's soiling incidents continued through 2016. *Id*.

The record reveals that Child has participated in outpatient counseling throughout the history of this case, and that he continued to attend counseling every week at the time of the termination hearing. *See id*., at 71. Ms. Saum testified that Child's current provider, Pennsylvania Behavioral Health, recommended family sessions with Mother. *See id*., at

71-72. She testified that when the provider "reached out to [Mother], they had no response. So that would be something ongoing that we were intending having Mother do[,] but she never followed through with that." *Id*., at 72.

Indeed, Ms. Saum testified that Mother has not recently "been involved with [Child's] counseling . . . appointments." *Id*., at 73. Further, she testified that Mother has never been involved in Child's academic progress, despite CYS providing her with the contact information of Child's teachers. *See id*. As such, Ms. Saum testified that Mother had been in minimal compliance with the permanency requirement to attend Child's medical and educational appointments. *See id*., at 74.

Based on the totality of the testimonial evidence, we discern no abuse of discretion by the orphans' court in concluding that Mother failed or refused to perform her parental duties far in excess of the statutory six-month period under Section 2511(a)(1). Therefore, Mother's first issue fails.[5]

_____

[5] Based on this disposition, we need not review Mother's issues with respect to Section 2511(a)(5) and (8). *See In re B.L.W.*, *supra*. Moreover, Mother did not preserve a challenge to those subsections in her concise statement of errors complained of on appeal pursuant to Rule 1925(a)(2)(i) and (b). Thus, Mother's second and third issues on appeal are waived. *See Dietrich v. Dietrich*, 923 A.2d 461, 463 (Pa. Super. 2007) (stating that when an appellant filed a Rule 1925(b) statement, any issues not raised in that statement are waived on appeal).

Although Mother does not raise an issue with respect to Section 2511(b), in light of the requisite bifurcated analysis, we review it. This Court has explained as follows:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). And in considering the affection a child may have for his or her natural parents, we have explained that

> > concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage

- 12 -

and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d at 535 (internal citations and quotation marks omitted).

Our Supreme Court has confirmed, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d at 267. The Court further stated that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id*., at 268 (citation omitted). The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the orphans' court found as follows:

Undoubtedly, as recognized by the [c]ourt during the termination hearing, there is some evidence of a bond between Mother and [C]hild. Over the course of [C]hild's placement, however, that bond became secondary to the bond developed between [C]hild and his foster parents. [C]hild has found stability in his foster home and has developed meaningful

- 13 -

relationships with the foster parents and other children in the home.

Trial Court Opinion, 10/31/16, at 7-8.

The court based the foregoing findings on its credibility determination in favor of Samantha Myers, the social worker from Bethany Christian Services, who worked with Child from September 2015 to December 2015. Specifically, the court found that

> [a]ccording to Ms. Myers, [Child] consistently expressed his desire to live with his foster family while preferring to visit with his biological mother and father. In two separate art therapy projects, [Child] described a closer and stronger relationship with the foster parents than with his natural parents. He described the relationship of the various parental figures by identifying his foster family as his "new family" and his biological parents as his "old family."

*Id*., at 8.

Upon review, Ms. Myers' testimony supports the court's findings. Further, the record reveals that Child has resided with his foster parents since September 2014, and they are a pre-adoptive resource. *See* N.T., Hearing, 9/8/16, at 23, 81.

In addition, the orphans' court found as follows:

> [Child] is doing extremely well with his foster family and gaining the confidence that a child develops with stability. The sole setback in [C]hild's growth was the sporadic visitations with Mother[,] which resulted in the harmful stress to the child as displayed by soiling. While in the care of his foster parents, [Child's] educational, medical, emotional, and dental needs have not only been fully met[,] but he has thrived. The emotional attachment between [Child] and his foster parents was obvious to anyone witnessing their interaction during the various court proceedings.

. . .

>Denying [Child] permanency with the foster family with whom he has truly bonded in the hope that Mother may someday act on a two-year history of hollow representations present the greater risk for [Child] than worth taking. . . .

Trial Court Opinion, 10/31/16, at 8.

Upon review, the testimonial evidence overwhelmingly supports the court's findings. As such, we discern no abuse of discretion by the orphans' court in concluding that terminating Mother's parental rights serves the developmental, physical and emotional needs and welfare of Child under Section 2511(b). Accordingly, we affirm the order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/3/2017

- 15 -